## Gulf, Colorado & Santa Fe Railway Company v. B. F. Powell et ux.

Decided December 17, 1904.

**1.—Contributory Negligence—Brakeman Uncoupling Cars.**

Where a brakeman, contrary to the rules, uncoupled a car supplied with air-brakes, without first cutting off the air on both sides of the car, which resulted in his being struck by the air hose flying round and thrown on the track and injured, he was guilty of such contributory negligence as precluded a recovery.

**2.—Same—Proximate Cause.**

The negligence of the brakeman in failing to cut off the air being a proximate and efficient cause of the injury, it was immaterial that negligence on the part of the engineer as to taking a stop signal from a wrong party may have in some degree contributed to the injury.

Appeal from the District Court of Bosque. Tried below before Hon. Wm. Poindexter.

*Lee & Goree* and *J. W. Terry,* for plaintiff in error.—1. All the testimony is that it was extra hazardous and dangerous to cut the air before uncoupling the cars, and that Powell had been so instructed and so understood. His act in so doing, therefore, was clearly negligent. A reasonable rule established and in force—provided for the protection of employes such as Powell, forbade him to cut the air before uncoupling

the cars.   Powell knew of and had been instructed as to the rule, and his disobedience thereof, which is shown by the undisputed evidence, was therefore negligence.   Texarkana & F. S. v. Atchison, 54 S. W. Rep., 1075; Gulf, C. & S. F. v. Bryant, 66 S. W. Rep., 805.   That the violation of the rule was negligent.   Galveston, H. & S. A. v. Brown, 95 Texas, 2; Murray v. Railway Co., 73 Texas, 2; San A. & A. P. Ry. v. Wallace, 76 Texas, 636; Pilkinton v. Railway Co., 70 Texas, 226; Bennett v. Nor. Pac. Ry., 49 N. W. Rep., 408; Southern Pac. v. Ryan, 29 S. W. Rep., 527; Fritz v. Railway Co., 30 S. W. Rep., 85; Gulf, C. & S. F. v. Hubert, 54 S. W. Rep., 1074.

2.   The cutting of the air before uncoupling the cars was, as a matter of law, a proximate cause of the accident, and there was no issue of proximate cause for the jury.   Texas & P. Ry. v. McCoy, 90 Texas, 265; Gulf, C. & S. F. v. Rowland, 90 Texas, 365; Culpepper v. Railway Co., 90 Texas, 621; Central T. & N. W. v. Hoard, 49 S. W. Rep., 142; Ebert v. Railway Co., 49 S. W. Rep., 1105; Fort W. & N. O. Ry. Co. v. Enos, 50 S. W. Rep., 595.

*Odell & Phillips* and *S. C. Padelford,* for defendant in error.—1.   An employe of railroad company is not presumed to anticipate that the company, or its agents acting for it, will be negligent toward its employes; but he can, in the performance of his duties, rely upon the fact that there will be no negligent act of the company towards him, and that such master will do his duty.   Railway Co. v. Bingle, 91 Texas, 288; Railway Co. v. Hannig, 91 Texas, 350; C. E. Co. v. Lubbers, 11 Col. 505 (7 Am. St. Rep., 255) ; Beems v. Railway Co., 58 Iowa, 150 (12 N. W., 222) ; Pringle v. Railway Co., 64 Iowa, 613 (21 N. W., 108).

2.   The issue as to whether the deceased was negligent, and whether such negligence was the proximate cause of his injuries, were questions of fact to be passed upon by the jury: and the court did not err in submitting the same to the jury; and their verdict in finding said issue in favor of plaintiffs is supported by the evidence.   Galveston, H. & S. A. Ry. Co. v. Pendleton, 70 S. W. Rep., 996; Texas & P. Ry. Co. v. Reed, 88 Texas, 439; Railway Co. v. Graves, 59 Texas, 330; Railway Co. v. Turner, 78 S. W. Rep., 715; Johnson v. Railway Co., 2 Texas Civ. App., 142; Galveston, H. & S. A. Ry. Co. v. Sweeney, 6 Texas Civ. App., 177; Sickles v. Railway Co., 13 Texas Civ. App., 438; Texas & P. Ry. Co. v. Woods, 8 Texas Civ. App., 446; Railway Co. v. Duncan, 10 Texas Civ. App., 484; Flynn v. Railway Co., 40 Cal., 19; Railway Co. v. Danshank, 6 Texas Civ. App., 386.

3.   The proximate cause of an injury is that efficient cause which in natural and continuous sequence, unbroken by any efficient unanticipated intervening cause, produces the injury, and without which the injury would not have occurred.   The remote cause is that cause which some unanticipated, independent force or agency merely took advantage of to accomplish something not the probable or natural effect thereof. That is, the remote cause is where the casual connection, between the original negligence and the injury, is interrupted by the interposition of an unanticipated, independent agency, which independent agency or intervener, acts as a nonconductor and insulator to the original negli-

gence, and makes the original negligence the antecedent or remote cause. Seale v. Railway Co., 65 Texas, 274; Wharton on Neg., sec. 134; Goodlander Mill Co. v. Standard Oil Co., 63 Fed. Rep., 400, 406; Railway Co. v. Kellog, 94 U. S., 469; Insurance Co. v. Boon, 95 U. S., 130; Gray & Bell v. Scott, 5 Am. Rep., 371 (66 Penn. St., 345); Railway Co. v. Moynaham, 76 S. W. Rep., 803; Railway Co. v. Schilling, 75 S. W. Rep., 64, 66; Railway Co. v. Gale, 35 S. W. Rep., 802.

CONNER, Chief Justice.—Defendants in error sued for damages because of the alleged negligent killing of their son, Amos Powell, at Clifton, Texas, by one of plaintiff in error's locomotive engines, and upon a trial were awarded a verdict and judgment for three thousand dollars. Plaintiff in error in various forms questions the sufficiency of the evidence to sustain the verdict or judgment, and insists that the undisputed evidence establishes its right to a judgment in its favor.

At the time Amos Powell was between twenty and twenty-one years of age, and in the employ of plaintiff in error as one of its brakemen on a local freight train running from Cleburne to Temple, Texas. His brother-in-law, W. J. Flenniken, was conductor, and one William Powell, not related, was the engineer. The train in question left Cleburne about 8 o'clock a. m. of the day of the injury, April 28, 1903, and arrived on its southbound journey at Clifton about 5 p. m. of the same day, at which point a northbound passenger train was expected soon to arrive, and where also a northbound local freight train was met standing upon switch track No. 2, east of the main track. The train upon which Amos Powell was brakeman entered upon switch track No. 1, which also extended along east of the main track. Coupled to the engine was a Texas and Pacific freight car which Flenniken desired to be transferred to a switch track extending west of the depot from the main track, and having, as he judged, sufficient time therefor before the arrival of the passenger train, he ordered Amos Powell to make the transfer. Amos Powell accordingly uncoupled this car from the remainder of the train, and the engineer proceeded southward until the engine and car arrived upon the main track where they were backed northward in the direction of the depot, some 500 feet, with the object of having the car cut loose from the engine at the proper place and received by a brakeman, one Chatham of the northbound freight train, to be coupled to the engine of said northbound train and by it transferred to the west switch track.

Flenniken testified upon his examination in chief, in substance and as quoted, that as Powell came from the south on the main line he was hanging on the side of the ladder on the southwest corner of the box car to be transferred, the ladder being next to the footboard of the engine; that he, Flenniken, was standing about opposite the depot on the gravel walk between the depot and the main line; that Chatham was about 20 or 25 feet north of where he was standing at the time; that Chatham gave him, Powell, a signal to cut off the car; that brakeman Powell then went on the foot board of the engine to cut off this box car; that Chatham gave the signal to kick the car and then to stop; "he gave the signal to the engineer"; Amos Powell at this time was on

the footboard of the engine and reached over "to turn the stop cock or angle cock," this being the contrivance that cuts the air out of the train line. "I did not see him turn the stop cock, but I saw him reach over there to it, and saw that it was turned afterwards, and I would naturally suppose he did it. . . . About the time he was reaching over there the car and the engine separated and he fell down and the engine backed up. I was looking at the work and saw the engine and car just as the accident happened. About the time he fell the engine was moving at about the same rate of speed as it was moving back a few feet before he fell.. I can not say whether or not the engineer obeyed the slack signal that was given before Amos Powell fell off of there or not. The first I noticed was when the man fell, I noticed him when he fell and I noticed the engine stopped right quick then. . . . When the kick signal was given as well as I remember the car commenced moving a little faster; when he got the stop signal as well as I can remember the engineer commenced to slow up. It began to slow up as well as I can remember about the time the boy fell off. He fell over right from him and must have turned after he fell. He was lying on his back and between his knee and thigh was lying across the iron railing of the track. . . . The wheel of the tender crushed his left leg between thigh and knee, cut it off, just left a little hanging there. . . . He died on the 30th of April thereafter. . . . My recollection is that Amos Powell fell off about the time the stop signal was given by Chatham. Just before the stop signal was given and at the time it was given Amos Powell was between the tender and box car leaning over the draw bar facing east. He was in that position I know almost at the time the stop signal was given."

On cross-examination this witness Flenniken further testified, among other things, that "the engine and car were coupled together down here at Clifton with the usual and ordinary air hose; the air hose comes down and out from under the tender and passes across and under the draw heads and over on the other side and couples on to the other car. The hose runs from the engine clear through the train and forms what is called the train line. The hose runs on through the train and is coupled together where the cars are coupled. The air hose comes out under the engine nearer to the engineer's side than to the other side of the engine. It is on the engineer's side of the draw head. These draw heads have automatic safety couplers attached to them. These cars are furnished with automatic couplers, that is, you can uncouple them by pulling a lever. The lever to be used in uncoupling these cars extends out to the edge of the cars. There is a double lever on the engine, that is so the brakeman can lift the brake from either side. He could pull this lever at the edge of the car and that would uncouple the cars. . . . A man standing on the footboard of the engine on the engineer's side of the engine this air hose would run down about his legs and would be about opposite to half way between his feet and his knees. . . . Yes, it is a fact that when this air hose parts in the .emergency it has a tendency to fly around with a great deal of force; it comes around there with a force of 70 pounds pressure, enough to stop a full train of cars when applied to the brake. . . . Yes, it is a

fact that the rules require that where you have got to cut a car off with air that before you lift the pin to uncouple the cars you must cut the air and uncouple the air hose, that is, you must turn the angle cock that cuts the air off and then apply the lever that uncouples the cars. It is not proper for a brakeman to cut the car off, that is, uncouple the cars, before he uncouples the air; it is dangerous for a man to cut his car off from the engine before he cuts the air off under circumstances like these, and that is the reason why the air must be uncoupled before the car is uncoupled. There is a cock on the hose like an ordinary faucet that you turn to cut the air out, and after the air is cut out then no air can pass down the train line; that is, it can not pass to the cars beyond where you have turned the cock. The air hose comes together about the center between the cocks, and are furnished with a patent contrivance that when you put your hands under the hose and lift them up they separate. It is not very difficult to raise up the hose, it takes some force, you have got to overcome this pressure. . . . The plan or rule is that a man on the footboard must hold on with one hand while he lifts it up with the other; that is the proper way to do it; the proper way is to cut the air cock on the engine and on the car and lift the hose up so they will separate. It don't make any difference which one you cut first so you cut both of the cocks; that is, it don't make any difference whether you cut the hose on the engine first or the hose on the car first, but you must cut them both before you pull the lever to uncouple. Yes, it is a fact that Powell was my brother-in-law, and I was anxious to see him do well and naturally took an interest in him and tried to learn him all I could about the work, that is the reason why I say he was an active man. I was taking pains with him. I thought he understood the process of uncoupling and cutting off this car. I don't know that he had done this thing in the same way before, but he had done it frequently. I suppose he has frequently gotten on the footboard of an engine and cut off a car, though at present I don't remember just such a case. He had been working for a number of months as brakeman, and this was one of the ordinary things to him. I don't know whether Mr. Powell had a book of rules or not, but I had fully explained these things to him, and the safe way in which he was to do the work. Yes, Chatham gave a kick signal and a stop signal. . . . I was looking at Chatham when he gave the signal, but I don't know whether the signal was taken by the engineer or not. A man can give another a signal, but he can not make him take it.

"So far as I know I have no knowledge one way or the other as to whether Powell saw and acted on the signal or not. I can say that Engineer Powell is a very careful engineer, at least I have always regarded him so. Yes, he had more occasion to watch for signals closely than I did; that was his business to notice it. I don't mean to say that it was no part of my duty to watch these signals, because it was my duty as conductor of the train to see pretty well everything that was going on around there as far as possible to do so. If I am busy I don't make a habit of stopping to watch them give signals. It is the special duty of the engineer to watch out for signals and get the right signal from the right man before he obeys the signal. . . . No, I can not say that Engi-

neer Powell got any signal to kick that car from Chatham at all; I don't know, I can only tell that the signal was given, what he done with it I don't know; that is for him to say; I can't say that he acted on it; I can tell you what happened that is all. I don't know whether he got the signal from Powell or not, and whether he acted on it or not, but only know the signal was given, and that's as far as I can go. Yes, when the cars separate and causes the air hose to part the effect is to set the brakes in the emergency, that is, if the brakes are in working order and the air is working. I heard the emergency cut on when this car and the engine separated. The engine only went something like six or eight feet after the car left. It went about the distance an ordinary engine would roll in spite of the brakes. Yes, I suppose to throw the brakes in the emergency is about the most severe shock you can give an engine with its own power. That is the most severe shock I know anything about an engine being able to give itself. The cars separating and the engine going on in the emergency seemed to happen there about the same time, all right together. The next thing I saw Powell fall to the ground. I don't remember whether the wheels slid along the rails as the engine stopped or not. . . . Of course if the cars had not been uncoupled when the engineer obeyed the slow signal the cars would have remained together, would not have parted. As to whether an experienced brakeman riding on the footboard of an engine would likely be thrown off by the slowing up of an engine will have to be governed by circumstances; of course if a man on the footboard would be on his guard all the time and would brace himself there is no danger of his falling off when the engine stops. . . . The safest and best way is to cut the air before he ever left the side track with the car; he could have gotten in there and cut the air out while the train was standing still and then stand at the edge of the car and apply the lever to uncouple the cars. If he had done all that it would be different, but I suppose he cut the car first. I don't say Powell cut these cars, I didn't see him just at the time he raised the lever. . . .

"Yes, I believe that Amos Powell made a mistake in raising the lever instead of cutting the air first. . . . I thought he made a mistake in not bracing himself. Yes, it is true I stated to you (Mr. Lee) in Temple two or three Sundays ago that the boy, meaning Powell, had made a mistake, and that was all there was to it. Of course the accident would not hardly have happened if he had had himself placed just right. Yes, I think I told the old man Powell that the boy had made the mistake in not doing this work right. The boy should have held on to something to be sure he was all right. No, I don't think the accident would have happened if Powell had cut the air before he uncoupled the cars. . . . I think he, Amos Powell, made a statement to me that he didn't know how it happened, and that it was not the fault of the employes or appliances. . . . I made a written statement or report of the occurrence. This statement didn't say anything about the signal given by Chatham. Yes, this statement states that every precaution was used to prevent injury, but it was unavoidable. . . . If these air cocks are working right they are easy to turn. It would take about as long to turn one of them as it would the faucet on a molasses barrel; they

were working all right so far as I know. I never heard any complaint made of them. . . . To kick a car means to move along against the car and get it to going fast and then turn it loose or stop the engine and let it roll on. The track was about level at the place where the accident occurred. . . . If the engine had kept up with the car they could not have separated even though the lever had been raised and the cars uncoupled, and in that event it would have been perfectly safe for one to uncouple the air while the two were in motion. . . . I didn't see Powell give the engineer a stop signal of any kind; he could have given him a signal, but if he gave him any signal I didn't see it; I was looking at him."

We have thus quoted freely from the testimony of Flenniken, inasmuch as it is upon his testimony, and his testimony alone, the verdict and judgment can rest, if at all.

The brakeman Chatham testified to the effect that he was standing at the north end of the platform of the depot at Clifton waiting for the car to come up, and that as the engine and car came up he gave what was called in railroad parlance a "kick signal and a cut off signal" to the brakeman Powell; that he (Amos Powell) got in position to obey the signal, and the witness in position to handle the car when it got to him. That he did not notice Amos Powell from that time on, as the car was pretty close to him, and he was preparing to get on it. That when he got to the ladder of the car Amos Powell was on the footboard of the engine. That "when I (Chatham) stepped on the ladder he (Amos Powell) had just pulled the pin that uncoupled the cars. He pulled the rod that raises the pin, the lock in the drawhead that lets the knuckle come out. I hallooed to him to look out, that his air was not cut. Just as I hallooed at him the hose separated and the air went into the emergency. It made a very loud report when the hose separated. Powell fell just at that time. He fell immediately after the air hose separated. The cars parted, the hose popped and Powell fell, all these three things happened in rapid succession. I never gave to the engineer or to anyone else a stop signal. I don't know whether brakeman Powell gave to the engineer a stop signal or not; I didn't see him give one— was not watching him. . . . I know the air was not cut on the engine because it went into the emergency. . . . The engineer could not release his engine, and I turned the angle cocks on the engine myself."

The engineer, William Powell, testified that he had been a railroad engineer for 14 years; that he heard the conductor Flenniken and the deceased arranging about the disposition of the car; that as they came up the main line Brakeman Powell was on the footboard of the engine giving the kick signals; that he saw Brakeman Chatham as they approached the depot standing on the gravel platform on the east side of the depot building, and saw him give a signal to kick the car down the main line and cut it off; that "Powell gave me the kick signal all the way back from the switch south of the depot until he gave me the stop signal. Yes, Powell gave me a stop signal; he gave me the stop signal almost immediately before he fell off of the engine. Immediately after he gave me the stop signal he fell off. At the time the stop signal

was given I knew the air was not cut off between the engine and cars. I knew this because when he gave the stop signal I applied the brakes to stop the engine and the instant he gave the signal the car rolled away, and just as the car rolled away I heard a report made by the air hose separating, it makes a very loud report, and the air went on and set the brakes in the emergency and stopped the engine very suddenly. . . . It was my duty as engineer on that engine to watch the brakeman I was working with, and in this case that was Amos Powell, and I was looking to him for signals. I never took and acted on any signal at all from Chatham there that day. . . . I was looking solely to Amos Powell for signals. Just before he fell I applied the air to stop the engine; I was trying to apply the air in response to his, Powell's signal to stop, but the amount of air I applied would have stopped the engine gradually, but the angle cock having been left wide open when the cars parted, the air flowed and set the brakes in the emergency and stopped the engine within a few feet. I only applied a little air to stop the train gradually. While Powell was in between the cars there if I had seen some one coming on the track and I saw that they were liable to be injured by the train of cars I would have applied the air and stopped the engine. The amount of air I applied would have depended upon the emergency required; if I saw it was necessary to stop the engine suddenly I would have done so."

All of the witnesses who testify on the subject unite in testifying that it was the rule in uncoupling cars supplied with air brakes to first cut the air on each side of the coupling before uncoupling the cars, and that it was dangerous not to do so. There is of course much other evidence in the record, but it relates to undisputed and immaterial matters, and the evidence quoted and the facts stated we think will sufficiently illustrate the conclusion we have reached.

It must at all events, we think, be conceded that if it be true as testified by the engineer that the stop signal was given by Amos Powell, and that the engineer acted upon this signal alone, that then no liability rests upon plaintiff in error, for in such case most certainly the act of deceased brought about his own injury. The evidence establishing this theory seems almost if not entirely conclusive, inasmuch as the brakeman Chatham testifies positively that he gave no stop signal to the engineer, and the engineer is equally as positive that he took no stop signal from Chatham, but acted alone upon the stop signal of Amos Powell, no other witness testifying on the subject save the witness Flenniken. However, it may be urged that inasmuch as it is undisputed that there was a cessation in the action of the engine in pushing the car onward, and inasmuch as Flenniken testified that he did not see Amos Powell give the engineer a stop signal of any kind although he was looking at him at the time, it is our duty in deference to the verdict of the jury and action of the court in overruling the motion for a new trial, to find that the engineer in fact, contrary to his duty, took and acted upon the stop signal of the brakeman Chatham. Upon such a premise defendants in error insist, (1) that if it be conceded that Amos Powell was negligent in uncoupling the car from the engine without cutting off the air, that this negligence produced merely an occasion or condition

of his injury, and only became an active instrument of his injury when acted upon and used by an unanticipated, intervening negligent act of the defendant; (2) that inasmuch as the evidence shows that at the time of the accident Amos Powell was between the car and the tender of the engine, in which position he could not see either the brakeman Chatham or the engineer, and that in such case he had the right to assume that the engineer would perform his duty, which would be to continue kicking the car until ordered by him, Amos Powell, to stop, the question of whether he, Amos Powell, was negligent in uncoupling the car before cutting off the air was one entirely for the jury.

If required to adopt the theory of the evidence stated, we nevertheless have no hesitation in concluding that Amos Powell was guilty of negligence in uncoupling the car before he cut the air off the engine, and it seems to us that the evidence also as clearly and as indisputably shows that he was guilty of negligence in failing to properly secure himself, by holding or otherwise, in his position on the footboard of the engine. The only question in this phase of the case upon which we have felt any hesitation was whether the negligence of Amos Powell was a contributing or proximate cause of his injury, but we have concluded that the undisputed evidence shows that it was. The deceased does not appear to have had long experience as a brakeman, but it is undisputed that he did have such experience and knowledge of an undoubted rule as to cause him to know that he was violating instructions in the manner in which he uncoupled the car in question. He must have known that with the car and engine uncoupled they were liable to part at any time, either with or without a stop signal, and that in such event, with the air in working order, the air hose would fly around against him in the manner indicated by the testimony, and the emergency brakes on the engine be thereby immediately applied causing the sudden stoppage of the engine which would almost inevitably, in the absence of a well secured position, throw him upon the track and under the wheels of the moving tender. We think the very thing that happened was one of the natural and probable consequences of his own negligence that must be held to have been within the contemplation of the deceased. Whether the engineer was negligent or not, it seems clear to us that the negligence of Amos Powell directly and proximately contributed to the final result. We think his negligence amounted to more than the establishment of a mere condition of danger. He voluntarily assumed an insecure position, and his voluntary act in first uncoupling the car and in then proceeding to cut the air may be said to be continuing acts in operation at the time of the engineer's negligence in starting to stop the engine, and that the whole, operating together, constitutes efficient causes of the result. Had the engineer not stopped at the time he did, it may be true, as defendants in error insist, that no injury could have resulted, but it likewise seems true that notwithstanding the engineer's negligence no injury would have resulted had Amos Powell cut the air before uncoupling the car, or even maintained a secure hold at the time. Possibly it might be profitable to review authorities in this connection, but so much has been said and written upon the subject of contributory negligence and proximate cause that

we will content ourselves by citing a few cases that we think illustrate and support the views expressed. See Wilcox v. S. A. & A. P. Ry. Co., 11 Texas Civ. App., 487, 33 S. W. Rep., 379; Gulf, C. & S. F. Ry. Co. v. Lovett, 74 S. W. Rep., 570; Chicago, R. I. & T. Ry. Co. v. Martin, 3 Texas Law Jour., 921, 79 S. W. Rep., 1101; Ebert v. G. C. & S. F. Ry. Co., 49 S. W. Rep., 1105.

It results from the foregoing conclusions that other assignments are immaterial, and that the verdict and judgment should be reversed and judgment here rendered for plaintiff in error, and it is so ordered.

*Reversed and rendered.*

Writ of error refused.